IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2025 Term

**FILED**
**March 21, 2025**
released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 23-419

LAWYER DISCIPLINARY BOARD,
Petitioner,

v.

PAUL J. HARRIS,
Respondent.

Lawyer Disciplinary Proceeding
Nos. 17-03-136, 21-01-230, and 22-02-240

LAW LICENSE SUSPENDED AND OTHER SANCTIONS

Submitted: January 14, 2025
Filed: March 21, 2025

Rachael L. Fletcher Cipoletti, Esq.
Chief Lawyer Disciplinary Counsel
Renee N. Frymyer, Esq.
Lawyer Disciplinary Counsel
Office of Lawyer Disciplinary Counsel
Charleston, West Virginia
Attorney for Lawyer Disciplinary Board

Robert P. Fitzsimmons, Esq.
Wheeling, West Virginia
Attorney for Respondent
and
Paul J. Harris, Esq.
Wheeling, West Virginia
Respondent

CHIEF JUSTICE WOOTON delivered the Opinion of the Court.

JUSTICE TRUMP, deeming himself disqualified, did not participate in the decision of this case.
JUDGE DARL W. POLING sitting by temporary assignment.

SYLLABUS BY THE COURT

1.      "This Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law." Syl. Pt. 3, *Comm. on Legal Ethics of W. Va. State Bar v. Blair*, 174 W. Va. 494, 327 S.E.2d 671 (1984).

2.      "A *de novo* standard applies to a review of the adjudicatory record made before the [Hearing Panel Subcommittee] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the [Hearing Panel Subcommittee's] recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the [Hearing Panel Subcommittee's] findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record."  Syl. Pt. 3, *Comm. on Legal Ethics of W. Va. State Bar v. McCorkle*, 192 W. Va. 286, 452 S.E.2d 377 (1994).

3.      "Rule 3.7 of the Rules of Lawyer Disciplinary Procedure[] . . . requires the Office of Disciplinary Counsel to prove the allegations of the formal charge by clear and convincing evidence."  Syl. Pt. 1, in part, *Law. Disciplinary Bd. v. McGraw*, 194 W. Va. 788, 461 S.E.2d 850 (1995).

4.     "Rule 3.16 of the West Virginia Rules of Lawyer Disciplinary Procedure enumerates factors to be considered in imposing sanctions and provides as follows: 'In imposing a sanction after a finding of lawyer misconduct, unless otherwise provided in these rules, the Court [West Virginia Supreme Court of Appeals] or Board [Lawyer Disciplinary Board] shall consider the following factors: (1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession; (2) whether the lawyer acted intentionally, knowingly, or negligently; (3) the amount of the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of any aggravating or mitigating factors.'" Syl. Pt. 4, *Off. of Law. Disciplinary Counsel v. Jordan*, 204 W. Va. 495, 513 S.E.2d 722 (1998).

5.     "In deciding on the appropriate disciplinary action for ethical violations, this Court must consider not only what steps would appropriately punish the respondent attorney, but also whether the discipline imposed is adequate to serve as an effective deterrent to other members of the Bar and at the same time restore public confidence in the ethical standards of the legal profession." Syl. Pt. 3, *Comm. on Legal Ethics of W. Va. State Bar v. Walker*, 178 W. Va. 150, 358 S.E.2d 234 (1987).

WOOTON, Chief Justice:

Respondent Paul J. Harris (hereinafter "Harris") objects to the recommendations of the Hearing Panel Subcommittee (hereinafter "HPS") of the Lawyer Disciplinary Board upon its consideration of a three-count Statement of Charges. The HPS found that Harris committed fifteen violations of the West Virginia Rules of Professional Conduct arising from Count 1, which primarily alleged that Harris violated various duties to clients and assisted with hiding marital assets; it found an additional eight violations as alleged in Count 2 regarding Harris's handling of a fee arrangement. However, the HPS recommended the dismissal of the third count due to the primary complainant's lack of credibility. Based upon these findings, the HPS recommended that Harris's law license be annulled; he objects to both the HPS's findings and recommended discipline. The Office of Lawyer Disciplinary Counsel (hereinafter "ODC") argues in support of the HPS's findings and recommendations in their entirety.

This Court has before it all matters of record, including the exhibits and a transcript of the evidentiary hearing conducted by the Board, as well as the briefs and argument of counsel. Based on this Court's independent review, we find that the violations of the West Virginia Rules of Professional Conduct alleged in Count 1 were not proven by clear and convincing evidence. As to Count 2, we find that Harris committed seven of the eight Rule violations identified by the HPS. Finally, with deference to the HPS's credibility determinations, we accept its recommended dismissal of Count 3. Therefore,

1

we modify the HPS's recommended sanction and order that Harris be suspended from the practice of law for two years and other sanctions as more fully set forth herein.

## I. FACTS AND PROCEDURAL HISTORY

Harris was admitted to the West Virginia State Bar in 1987 and practices in Wheeling, West Virginia; he approximates that half of his practice has historically been dedicated to criminal defense work. He has two prior admonishments—in 1995 and 2001—for violations of Rule 1.15 regarding safekeeping property.

As indicated, the twenty-three Rule violations found by the HPS are premised on two counts of a three-count Statement of Charges.[1] Count 1 pertains to Harris's representation and conduct during serial litigation involving Emil N. and his now-ex-wife, Healy B.-N.[2] Count 2 pertains to fees charged by Harris in connection with his representation of Rocky Tingler ("Tingler") for a criminal defense matter. This disciplinary proceeding yielded numerous pre-hearing filings and contentious objections during the February 20 and 21, 2024, evidentiary hearing, during which twenty-one

---

[1] Count 3 is based on the complaint of Thomas Carr regarding Harris's handling of, among other matters, a conservatorship and related tax issues involving Mr. Carr's disabled daughter, Brittany. Mr. Carr became incapacitated during the proceedings and his son Travis testified in his stead; his demeanor and testimony were deemed to be so incredible that the HPS recommended dismissal of this count altogether. ODC makes no objection to this recommendation. In view of the HPS's credibility determinations pertaining to this count, we accept its recommended dismissal.

[2] Consistent with our use of initials in the related divorce proceeding involving these parties, we use initials to maintain their confidentiality. *See Emil N. v. Healy B.-N.*, No. 20-0396, 2021 WL 2020296 (W. Va. May 20, 2021) (memorandum decision).

witnesses testified before the HPS and over 3,600 pages of exhibits were admitted as evidence. Our discussion is necessarily limited to those facts pertinent for contextual development and analysis of the HPS's findings and recommendations.

### A.    Count 1

The allegations in this count were developed based upon a March 27, 2017, complaint filed by Attorney Elgine McArdle, who represented Healy B.-N. in her divorce from Emil N. The allegations pertain, in part, to Harris's conduct relative to assets allegedly subject to equitable distribution in those divorce proceedings, but further implicate Harris's representation and conduct in a federal criminal investigation, a related civil suit, and a declaratory judgment action regarding a family trust—all involving Emil N. and Healy B.-N. These allegations were supported by testimony from Attorney McArdle, as well as Attorney Mike Kelly, who substituted as counsel in place of McArdle in the divorce and declaratory judgment actions.[3] Notably, Healy B.-N. neither appeared nor testified in the underlying disciplinary proceedings and ODC provides no explanation for her absence.

*The Criminal Investigation and Trust*

In late 2012, Emil N. was served with a federal grand jury subpoena for patient medical records within his chiropractic practice and retained Harris to represent

---

[3] Harris also filed lawsuits against Attorney McArdle and Attorney Kelly for matters arising during the divorce proceedings.

3

him. Harris's testimony below suggests that, at some point, Healy B.-N.—Emil N.'s then-wife who worked at the chiropractic clinic—likewise became implicated in the investigation. Although this criminal investigation ultimately yielded no charges against Emil N. or Healy B.-N, it precipitated civil litigation filed by Harris that same year on Emil N.'s behalf against The Health Plan for its refusal to reimburse for services rendered by his practice.

Documents contained in the appendix record dated between January and July 2013 reflect three signed representation agreements between Harris and Emil N. for the "federal investigation" and the "Health Plan [litigation]"—none of which reference Healy B.-N. or contain her signature. Further, the record contains an "Acknowledgement" dated February 21, 2013, signed by Emil N. and Healy B.-N. stating that

> because [Emil N.] has been served with a Federal Grand Jury subpoena and also has various other legal matters and because [Emil N.] and [Healy B.-N.] operate their own separate businesses, both acknowledge and agree [Harris] has represented and will continue to represent [Emil N.]. However, . . . [Healy B.-N.] may assist in providing information related to [Emil N.'s] legal issues.

In mid-2013, Harris met jointly with Emil N. and Healy B.-N. for the purpose of executing a trust agreement that was allegedly designed, in part, to ensure payment of Harris's attorney fees relative to the federal investigation. Harris testified that the trust "had consequences" with respect to the criminal investigation and that he asked Emil N. and Healy B.N. "what sort of estate issues they had" when he was first approached about

4

representing Emil N. Harris and Emil N. testified that at that meeting Emil N. and Healy B.-N. executed a trust agreement as co-grantors that purportedly named them both as beneficiaries ("Trust 1").[4]  However, they contend that after executing Trust 1, Healy B.-N. "became unhinged" when Harris began discussing the federal investigation, declaring she did not want to be part of the trust agreement and left the meeting.  Two of Harris's long-time investigators, Franklin Street and Catherine Wolfe, were also present at the meeting and corroborated these events before the HPS.  Harris and Emil N. testified that, as a result, Harris then prepared a second trust ("Trust 2") naming only Emil N. as grantor and beneficiary, which Emil N. allegedly executed later that day.  Both Trust 1 and Trust 2 designate Harris as trustee.[5]

During the disciplinary proceedings, Harris produced a July 29, 2013, letter from Harris to Emil N. purportedly hand-delivering Trust 2, stating that the trust "has been changed to reflect the wishes of your wife, to which you have agreed.  As you will recall, the issue of the changes was discussed at length in my office on July 27, 2013.  Per my request, your wife has acknowledged the acceptability of the changes in writing."  Harris

---

[4] The beneficiaries were identified on an attached "Schedule," but no such schedule was produced below. Harris presented expert testimony at the disciplinary hearing from Attorney Herman Lantz to the effect that, because no schedule naming a beneficiary was produced, Trust 1 was invalid.

[5] We note that Trust 1 expressly provides for use of its net income "for the comfort, support, education, maintenance, health and welfare of the beneficiaries."  Trust 2 expressly adds "legal fees" to this provision.  Despite claiming that Trust 2 was part of a greater scheme to divert marital funds through Harris by way of attorney fees, neither ODC nor the HPS comment on this somewhat obvious incongruity.

also produced a handwritten note from Healy B.-N. dated July 29, 2013, stating that "[t]he contract is sufficient"; Harris contended that this note references and demonstrates Healy B.-N.'s awareness of and consent to Trust 2. On August 2, 2013, a farm that yielded mineral royalties was deeded to the trust.

*The Divorce Proceedings*

Approximately three years later—in March 2016—Emil N. and Healy B.-N. separated. In May, Healy B.-N., represented by Attorney McArdle, filed for divorce; Emil N. was represented for most of the proceedings by Attorney Robert McCoid. Harris did not represent either party in the divorce. However, during the divorce proceedings, Attorney McArdle alleged that Emil N. and Harris had conspired to divert approximately $650,000 of marital assets to avoid equitable distribution. In support, Attorney McArdle identified several checks that she claimed were to be deposited and held in trust but were instead disbursed to Harris as payment for attorney fees. At a family court hearing on December 15, 2016 ("the family court hearing"), Attorney McArdle subpoenaed Harris to testify about these funds.

Under examination at the family court hearing, Harris testified regarding the two above-described trusts, claiming that Trust 2—which identified only Emil N. as beneficiary—was the "prevailing document" and that the farm deeded to the trust was Emil N.'s separate property, pre-dating the marriage. Before the HPS, Attorney McArdle testified that this was the first she learned of the existence of Trust 2. The appendix record

6

contains no testimony from Healy B.-N, during this hearing or from the family court proceedings generally.[6]

During the family court hearing, Attorney McArdle further explored the scope of Harris's prior representation of Healy B.-N. Harris testified that although he represented Healy B.-N. and/or her business in several "miscellaneous matters," none of those were materially related to the creation of the trust documents.[7] With respect to the scope of his representation of Healy B.-N. in the criminal investigation, Harris testified: "Well, she hadn't signed a fee agreement with respect to the issue, but I looked at both of them as my client because they both were under investigation by the Federal and state authorities with respect to health care fraud issues and tax fraud issues." With respect to the preparation of the trust agreement, Harris testified that he "explained the risks and

---

[6] Although Healy B.-N. did not testify in these disciplinary proceedings, we acknowledge the presence of a sworn affidavit executed by her contained in the voluminous appendix record. This affidavit was attached as an exhibit to a motion filed in the declaratory judgment action regarding the trusts, discussed *infra*. As pertains to this issue, the affidavit states, in pertinent part, that: 1) she was unaware of Trust 2; 2) she never requested or agreed to "revocation of [Trust 1]"; and 3) Trust 2 was "fraudulent" and created after the parties' separation "to deprive me of my interest in the gas producing property." Although the circuit court file from the declaratory judgment was admitted as evidence in the proceedings below, we find no reference to or reliance on this affidavit by ODC in the disciplinary proceedings or its briefs to this Court. More importantly, we find no reliance on its contents by the HPS. *See* nn.8 & 29.

[7] Documents in the appendix record confirm Harris's individual representation of Healy B.-N. and/or her business in three matters, from which he ultimately withdrew: 1) a debt collection case filed by her company against a client; 2) a "minor car accident case"; and 3) a case involving Healy B.-N.'s allegedly improper retention of an engagement ring.

7

benefits of an irrevocable trust . . . I'm only assuming that they both asked me to do it; I can't remember, though."

*The Summit Proceeds and Main Street Bank Account*

As part of her claim that Emil N. and Harris were diverting marital assets intended for the trust, Attorney McArdle also examined Harris about a March 13, 2015, check in the amount of $93,480, issued by Summit Midstream Utica, LLC as payment for a right-of-way agreement pertaining to the farm deeded to the trust (the "Summit proceeds"). Before the HPS, Emil N. and Harris testified that despite this right-of-way payment pertaining to Emil N.'s "separate property," the check was initially improperly issued in Healy B.-N.'s name. Harris recalled that the check was later reissued as payable to the family trust alone as deed owner of the subject property; a copy of the check contained in the appendix record reflects that it is payable solely to "The [N.] Family Trust." The Summit proceeds were then deposited into a trust account Harris opened at Main Street Bank in the name of "Healy B[.]-N[.] and The [N.] Family Irrevocable Trust."

Harris further testified that Emil N. and Healy B.-N. were living in Arizona at the time the Summit proceeds were received and that he obtained their permission to open the account at Main Street Bank to negotiate the check. He claimed Healy B.-N. was placed on the account as "another signer" and that he used her expired drivers' license to open the account with her permission. After depositing the Summit proceeds, Harris wrote a check to himself in the amount of $92,000 that he claimed was for attorney fees relating

8

to his representation of Emil N.; he deposited the check into his IOLTA account at Main Street Bank. In the proceedings below, Harris produced a March 19, 2015, email to Emil N.'s email address—but captioned to "Emil and Healy"—stating: "[I]n order to deposit the check related to the farm an account will need to be set up and I need a driver's license from one of you. . . . Also, as discussed, you agree to use these funds to pay down the outstanding balance with my office." Emil N. testified that the trust was established for the purpose of paying attorney fees and confirmed that he authorized payment of those attorney fees from the Summit proceeds.[8]

*Hiding of Marital Assets*

At the family court hearing, Attorney McArdle further explored her claim that Emil N. and Harris conspired to improperly divert marital assets. She claimed that in 2013, 2014, and 2015, a total of approximately $650,000 in marital assets were deposited into Emil and Healy B.N.'s joint account and that "[e]ither the same day or within weeks . . . virtually identical amounts" were then written to Harris and deposited into his IOLTA account.[9]

---

[8] Like the trust agreement issue, the only evidence from Healy B.-N. contained in the record on this issue is the affidavit filed in the declaratory judgment action in which she states that Harris "clandestinely" opened the account and that she never agreed to or knew about the account, the deposit of the Summit proceeds, or the payment of $92,000 for Harris's attorney fees. *See* nn.6 & 29.

[9] The total amount of allegedly diverted funds calculated by Attorney McArdle included: 1) a November 2013 deposit of $115,000 into Emil N. and Healy B.-N.'s joint account which amount was immediately paid back out to Harris, who placed it into his

9

Before the HPS, Harris and Emil N. claimed these 2013-2015 payments represented attorney fees incurred in Harris's representation of Emil N.; therefore, they could not have been attempting to hide marital assets for purposes of the 2016 divorce proceedings. Emil N. and Harris both testified that $650,000 for attorney fees was reasonable in light of the complexity of the representation, which included "hundreds" of witness interviews and daily communication; an invoice contained in the appendix reflects over $700,000 in fees. Emil N. testified that Healy B.-N. was aware of and consented to the fee arrangement; Harris produced a November 2015 email from Healy B.-N. entitled "[d]ocument for legal fees," that Harris claimed demonstrated her awareness of and consent to payment of his attorney fees.

In addressing Attorney McArdle's claims about these funds, the family court declared that while it had "cause for concern" about the competing trusts, it did not have

IOLTA account; the memo line read "[N.] Family Trust"; 2) an August 2014 deposit of $226,778.91 into their joint account for sale of the marital home; nearly four months later, a check in the amount of $235,000 was issued to Harris who again placed it into his IOLTA account. The memo line on the check read "trust"; 3) a November 2015 stock liquidation and deposit in the amount of $213,997.05 into their joint account; a check in the amount of $200,000 was immediately written back out to Harris; and 4) the Summit proceeds, discussed *supra*.

Attorney McArdle also alleged that the memo lines of certain of these checks were "whited out" evidencing fraud, which allegation formed the basis of two additional alleged Rule violations in Count 1. Harris testified before the HPS that the checks were redacted for litigation purposes during the Health Plan litigation. The HPS found no wrongdoing in this regard, finding that Harris presented "compelling testimony" that the checks were redacted for use in that litigation and exonerated him of the two Rule violations associated with those allegations. As previously noted, ODC does not object to these findings, nor do we find any reason to disturb them.

10

subject matter jurisdiction over allegations of "fraud or conspiracy" or "issues of misconduct and/or breaches of fiduciary duty relating to the mishandling of money within the trust[.]" The family court then addressed each of the allegedly misappropriated sums finding only that, assuming the existence of an irrevocable trust, those monies "do[] not appear to have been a part of the marital estate on the date of separation" because the monies "[weren't] there [in the trust account] on the date of separation[.]" Ultimately, the family court's equitable distribution between Emil N. and Healy B.-N. was appealed to this Court, which we affirmed. *See Emil N.,* 2021 WL 2020296.

However, before the HPS, in further support of Attorney McArdle's claim that these "attorney fee" payments were merely an attempt to "launder" marital assets through Harris, ODC introduced financial documents demonstrating that Harris funneled $900,000 in funds back to Emil N. through his office operating account from August 2013 through October 2022. Emil N. testified that $600,000 of this amount constituted repayment of a loan Emil N. made to Harris's cousin's business. More specifically, Emil N. testified that Harris's cousin "Anna"—whose last name he could not recall—"had a business where I'd loaned her money, and she pays interest on the loan."[10] Emil N. explained that recurring payments to him of $8,500, among others, from Harris's operating

_____

[10] Although he claimed not to recall her last name, Emil N. testified that her business was "J and E Enterprises" doing business as "Jill's Lounge." He testified that Harris may have prepared the loan agreement between him and Anna but did not recall signing a conflict waiver. Neither the record nor the instant charges reflect further investigation of this issue. *See* text *infra*.

accounts reflected these loan repayments, testifying that "she probably paid him and then he paid me or whatever. Lately, she's been paying me directly." Although Emil N. contended the payments from Harris's operating account to him constituted repayment of this loan, Harris was equivocal on whether his account would reflect receipts from "Anna" in those amounts and why they were paid through his operating account. Harris ultimately contended he did not know these payments were an issue in the disciplinary proceedings and would need to examine the issue further. Emil N. also testified that he and Harris "have houses, a whole bunch of apartments" which they have operated through an LLC since 2016 or 2017; Harris testified that certain of the outgoing payments to Emil N. were disbursements relating to the LLC.

*The Declaratory Judgment Action*

As a result of the family court's refusal to exercise jurisdiction over the allegations of fraud relating to the trusts, on March 28, 2017, Harris filed a declaratory judgment action in the name of the "[N.] Family Trust" against Healy B.-N.[11] and expressly sought a declaration that Trust 2—which excluded her as a beneficiary—was the operative trust. The petition for declaratory relief designates Harris as counsel for the trust.

Attorney Kelly, who substituted as counsel for Healy B.-N. in place of Attorney McArdle, moved to disqualify Harris as counsel for the trust alleging a conflict of interest due to his prior representation of Emil N. and Healy B.-N., as well as his role as

---

[11] At some point, however, Emil N. was added as a named respondent in the matter.

12

a material witness with regard to preparation of the trust agreements. The circuit court granted the motion, noting that Harris's "conflicts in this case are multi-faceted" because Emil N. and Healy B.-N. were "former and/or present clients" and suggesting that Harris may have breached duties of loyalty in his role as trustee by filing the declaratory judgment action.

The declaratory judgment action was settled in July 2021, with the parties agreeing to appraise and sell the farm deeded to the trust, sell the oil and gas rights and split the proceeds equally, and split any interim royalty payments equally. In October 2021, Attorney Kelly filed a motion to enforce settlement and to remove Harris as trustee, claiming that he was dilatory in issuing royalty payments due to Healy B.-N. pursuant to the settlement terms. The circuit court declined to remove Harris at that time but did order certain activities to aid in consummating the settlement. In April 2022, Attorney Kelly filed a second motion to enforce settlement and remove Harris as trustee; in response, Harris resigned as trustee. Notwithstanding his resignation, the circuit court thereafter granted the motions to enforce settlement and remove Harris, finding that it was "basically undisputed" that Harris was "dilatory and negligent" in carrying out the settlement terms.[12] Attorney Kelly testified before the HPS that it was a "constant struggle" to get Harris to

---

[12] Specifically, Attorney Kelly contended that Harris failed to promptly issue royalty checks, issued them in Healy B.-N.'s maiden name, and refused to participate in efforts to consummate the settlement including providing information regarding surface payments and engaging an appraiser and realtor.

13

send royalty payments, that he was provided no justification for Harris' conduct, and that he had never encountered another attorney as "obstructive" as Harris.

With regard to Count 1, the HPS found fifteen violations of the West Virginia Rules of Professional Conduct. As to Harris's handling of the Summit proceeds and opening of the Main Street Bank account, the HPS found violations of Rules 1.4(a)(1) and 1.4(b) (requiring informed consent of client)[13] as well as Rules 8.4(b) (prohibiting criminal act reflecting dishonesty or untrustworthiness),[14] 8.4(c), and 8.4(d) (prohibiting conduct involving dishonesty, fraud, deceit, or misrepresentation and prejudicial to administration of justice).[15] As to the alleged conspiracy to "hid[e] marital assets subject to equitable distribution[,]" the HPS found Harris violated Rule 1.9 (regarding duties to former client),[16] and Rules 8.4(c) and 8.4(d). With regard to the declaratory judgment action, the HPS found

---

[13] Rule 1.4(a)(1) and (b), in pertinent part, require a lawyer to "promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.0(e), is required by these Rules[]" and "explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."

[14] Rule 8.4(b) provides that it is "professional misconduct" for a lawyer to "commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects[.]"

[15] Rule 8.4(c) and (d) provides that it is "professional misconduct" for a lawyer to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation[,]" or "engage in conduct that is prejudicial to the administration of justice[.]"

[16] Rule 1.9 provides, in part, that "[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing."

14

Harris committed as separate violation of Rule 1.9, as well as Rule 1.7 (regarding duties to current client),[17] and 3.7(a) (prohibiting attorney as witness).[18] Finally, because of his alleged dilatory conduct, the HPS found violations of Rules 1.3 (requiring diligence),[19] 3.2 (requiring expedition of litigation),[20] and 3.4(c) (prohibiting disobedience to obligation of tribunal rules),[21] as well as Rule 8.4(d).

## B.    Count 2

The allegations in this count are premised upon Tingler's June 24, 2021, disciplinary complaint regarding Harris's fee for representation in a criminal matter. On October 9, 2017, Tingler retained Harris to represent him in a federal tax matter. However, Tingler had previously retained Attorney Harry Smith to represent him in the matter for $2,500. Having later received a recommendation to retain Harris, Tingler testified that he then met with Harris who told him he needed $50,000 "to get started" on his defense and that $10,000 would be used to hire a forensic accountant. Tingler paid Harris $50,000 in

---

[17] Rule 1.7 provides, in pertinent part, that "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest."

[18] Rule 3.7(a) provides, in pertinent part, that "[a] lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness[.]"

[19] Rule 1.3 provides that "[a] lawyer shall act with reasonable diligence and promptness in representing a client."

[20] Rule 3.2 provides that "[a] lawyer shall make reasonable efforts to expedite litigation consistent with the interest of the client."

[21] Rule 3.4(c) provides that a lawyer shall not "knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists[.]"

15

two $25,000 increments, which amounts were deposited into Harris's IOLTA account in October and November 2017. In November 2017, Tingler received notification by letter that he was also the subject of a Department of Labor ("DOL") investigation and asked Harris to assist him with that matter as well; Harris retained Attorney Dean Williams to handle the DOL matter, which Tingler testified was resolved quickly and to his satisfaction.

It is undisputed that, despite agreeing to represent Tingler in the tax matter, Harris never contacted Attorney Smith to advise of his retention or request Tingler's file materials; Harris likewise never contacted the United States Attorney or any other government agents to advise of his representation of Tingler or otherwise discuss the matter. Tingler testified that he would occasionally receive a call from Attorney Smith regarding his case but did not want to hurt his feelings by telling him he had retained Harris. Tingler testified that on these occasions, he would then contact Harris who would state he was working Tingler's case and that he was going to contact Attorney Smith to get Tingler's file. On one occasion, however, Tingler testified that Harris appeared not to know who he was.

In February 2019, Tingler filed a financial affidavit seeking court-appointed counsel; he testified that he financially qualified for appointed counsel, in part, because he depleted his funds by paying $50,000 to Harris. Attorney Smith was then court-appointed to represent Tingler, and in May 2019 negotiated a plea agreement with the government on Tingler's behalf. On July 2, 2019, an information was filed against Tingler to which he

16

pleaded guilty and was later sentenced to six months in prison. Harris testified that at some point he had a phone conversation with Tingler during which he indicated he was "gonna go . . . with [Attorney Smith]" because he wanted to plead guilty.

On October 7, 2019, Tingler wrote to Harris terminating his representation and requesting a complete copy of his file within twenty days, a detailed invoice of work performed, and a refund of the "balance remaining of the $50,000 advance payment[.]" On October 24, 2019, Harris replied by letter stating that "[t]he fee agreement was a set fee[]" but that he would provide an itemization of work performed. Having received nothing from Harris, on December 11, 2019, Tingler again wrote to request his file and fee itemization, along with "a copy of this 'fee agreement' we allegedly had." On February 10, 2020, Harris responded regarding the requested itemization, claiming that he was awaiting an invoice from Attorney Williams for his work on the DOL matter, and would forward the requested information upon receipt.

On February 22, 2020—and over four months after his initial request—Harris provided Tingler with an itemized billing statement and purported fee agreement. The invoice from Harris Law totaled $44,550.43, which included $4,020.43 for investigative expenses and $5,535.00 paid to Attorney Williams. The purported fee agreement—in the form of an October 10, 2017, letter from Harris to Tingler on Harris's letterhead—provides, in pertinent part: "You have retained Harris Law Offices to handle this matter on a fixed fee basis of $50,000." The letter is signed by Harris but contains no

17

signature or designated area for Tingler's signature. Before the HPS, Harris testified that he emailed the agreement to his investigators to obtain Tingler's signature, but never received a signed copy back from them. The same investigators who testified in regard to Count 1—Street and Wolfe—confirmed that Harris emailed the agreement to them, that Tingler signed the agreement, and it was later returned to Harris. In the proceedings below, Harris never produced an agreement signed by Tingler.

Tingler retained Attorney Scott Summers to assist him with recovery of his fee from Harris. On December 28, 2020—over a year since Tingler first requested it—Harris overnighted Tingler's file to Attorney Summers. Attorney Summers prepared an inventory of the file materials, which he testified contained little to no evidence of any work conducted by Harris on the matter, but rather work done by others: specifically, copies of sworn statements taken by an investigator and a copy of the DOL matter handled by Attorney Williams. Attorney Summers's inventory of the file materials revealed no correspondence other than post-termination correspondence between Harris and Tingler and one pre-retention letter from Tingler to Harris. The file also included multiple bound copies of administrative and regulatory guidelines, along with assorted legal research and 131 pages of proposed jury instructions. Attorney Summers characterized the printed regulations and manuals contained in the file as "nice and crisp" and emphasized that the file contained no attorney notes, and the invoice reflected $23,000 dedicated to legal research alone.

18

On March 9, 2021, Attorney Summers wrote to Harris outlining that Tingler took the position that Harris did nothing to represent him during the two-year period and agreed only to the payment of Attorney Williams's fee for the DOL matter. On March 26, 2021, Harris responded by letter enclosing a "courtesy" refund of $5,449.57—the difference between his itemized invoice and the $50,000 retainer. Harris's response to Attorney Summers closed with: "In the event you proceed with filing a case, I will sue you personally."

Before the HPS, Tingler denied that Harris told him the $50,000 was a "flat fee" and that Harris's October 2019 letter was the first time Harris indicated the retainer was a "set fee[.]" Tingler testified that he "never heard hardly anything" from Harris, met with him only twice, and disputed certain specific items on the itemization including the necessity of seventy-seven hours of legal research and other assorted matters. Tingler recounted telling his family after the meeting that he "may end up paying 150,000 or two" and that he "figured [he] was going to be paying a lot more." Tingler denied ever seeing or signing the alleged fee agreement produced by Harris.

Before the HPS, Harris testified that he placed Tingler's $50,000 in his IOLTA account upon receipt; bank records confirmed receipt of two payments of $25,000 in October and November 2017. The bank records further reflected that through a series of "telephone transfers" Harris had emptied the entirety of this amount—and more—into his operating account by December 2017, leaving the IOLTA account with a $5.13 balance.

19

Harris argued that despite the balance of his IOLTA account, his "trust fund balance" was actually $319,000 in the form of cash kept in a "series of safes" in his office "[s]o there was sufficient funds to cover anything."[22]

Harris further testified the "flat fee" was "for [Tingler's] benefit" because he would be unable to pay fees incurred if he actually went to trial, which were likely to be "five times" that amount. Harris agreed with his counsel's contention that "since it's a set fee[,] . . . once it's paid it's yours" and testified that "[w]hen you pay a lawyer a set fee, it isn't just for the lawyer's time. It's . . . so this person is available to represent you." Harris also offered an expert witness in the field of criminal defense, Attorney Robert McCoid— the same attorney who represented Emil N. in the divorce action involved in Count 1. Attorney McCoid testified that $50,000 was a reasonable fee to charge for the Tingler matter and that Harris's abilities were well-regarded for such cases. With respect to the amount of legal research reflected on his invoice, Harris testified that "tax law changes every day," that Tingler had a "unique defense," and that "any tax issue can be very complicated." Attorney Smith, however, testified that Tingler's case was "straightforward," that he had never performed seventy-seven hours of legal research on a similar case, and incurred only approximately $8,500 in fees.

---

[22] When ODC suggested Tingler's money should have been maintained in the trust account, Harris argued that "all I'm required to do is have my trust fund balance, whether it's in the account or whether it's in cash reserves[.]" Harris provided no documentation regarding these alleged cash reserves, but again denied awareness that the reserves were an issue.

The HPS found that Harris's conduct as alleged in Count 2 resulted in eight violations of the Rules: Rules 1.5(a) and 1.5(b) (requiring fees to be reasonable and in writing),[23] Rules 1.15(a) and 1.15(b) (requiring safekeeping of client funds),[24] Rule 1.16 (requiring refund of unearned advance payments),[25] as well as additional violations of Rules 8.4(b), 8.4(c), and 8.4(d).

## C. *Sanctions*

Based upon these twenty-three Rule violations, the HPS evaluated the appropriate sanction pursuant to Rule 3.16 of the West Virginia Rules of Lawyer Disciplinary Procedure.[26] The HPS's discussion of Rule 3.16 focused almost exclusively

---

[23] Rule 1.5(a) and (b) provide, in pertinent part, that "[a] lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses[]" and that "[t]he scope of the representation and the basis or rate of the fee and expenses for which the client will be responsible shall be communicated to the client in writing, before or within a reasonable time after commencing the representation[.]"

[24] Rule 1.15(a) and (b) provide, in pertinent part, that a lawyer "shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property[,]" that "[f]unds shall be kept in a separate account designated as a 'client's trust account'" and that a lawyer "may deposit the lawyer's own funds in a client trust account for the sole purpose of paying bank service charges on that account[.]"

[25] Rule 1.16 provides, in part, that "[u]pon termination of representation, a lawyer shall . . . surrender[] papers and property to which the client is entitled and refund[] any advance payment of fee or expense that has not been earned or incurred."

[26] *See* W. Va. R. Law. Disciplinary P. 3.16 (requiring consideration of "(1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession; (2) whether the lawyer acted intentionally, knowingly, or negligently; (3) the amount of the actual or potential injury caused by the lawyer's misconduct; and (4) the

on Count 2 and concluded that Harris's "pattern and course of misconduct"—particularly as pertained to failure to safekeep funds—breached duties to clients, the public, the profession, and legal system. The HPS further found Harris's conduct intentional based upon the deliberate transfer of Tingler's retainer from his IOLTA account and the filing of the declaratory judgment action referenced in Count 1. As to injuries resulting from Harris's conduct, the HPS referenced the impact misappropriation of funds has on the public's perception of the profession, Healy B.-N.'s "presumabl[e]" anxiety, worry and aggravation due to Harris's "obstruct[ion]" of the proceedings related to the trust, and Tingler's inability to obtain a refund of his retainer balance.

The HPS found no mitigating factors, but found Harris's dishonest or selfish motive, substantial experience in the practice of law, and two prior admonishments for violations of Rule 1.15 as aggravating.[27] Noting that this Court has consistently held that "misappropriation or conversation . . . of funds . . . warrants disbarment[]" and further emphasizing Harris's conflicts of interest, unreasonable fee, and "repeated acts of misconduct," the HPS recommended annulment of Harris's law license.

---

existence of any aggravating or mitigating factors" in fashioning sanction); *see also* Syl. Pt. 4, *Off. of Law. Disciplinary Couns. v. Jordan*, 204 W. Va. 495, 513 S.E.2d 722 (1998).

[27] We note that, despite Count 3 being recommended for dismissal, the HPS improperly referenced complainant Thomas Carr's status as a vulnerable victim as an aggravating factor.

22

## II. STANDARD OF REVIEW

As is well-established, "[t]his Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law." Syl. Pt. 3, *Comm. on Legal Ethics of W. Va. State Bar v. Blair*, 174 W. Va. 494, 327 S.E.2d 671 (1984). Accordingly, with respect to the HPS's recommendations, we give them "respectful consideration," but maintain plenary review. Syl. Pt. 3, in part, *Comm. on Legal Ethics of W. Va. v. McCorkle*, 192 W. Va. 286, 452 S.E.2d 377 (1994). And while "substantial deference is given to the [HPS's] findings of fact," they must be "supported by reliable, probative, and substantial evidence on the whole record." *Id*. In that regard, we observe that the Rules "require[] the Office of Disciplinary Counsel to prove the allegations of the formal charge by clear and convincing evidence." Syl. Pt. 1, in part, *Law. Disciplinary Bd. v. McGraw*, 194 W. Va. 788, 461 S.E.2d 850 (1995). With these standards in mind, we proceed to our review of the HPS's findings and recommended discipline.

## III. DISCUSSION

Through a variety of separate assignments of error, Harris argues generally that ODC failed in its requisite burden to establish the Rule violations that form the basis of the HPS's recommended sanction. He argues further that the HPS's recommendation that his law license be annulled is disproportionate because the complainants were not

23

injured and their complaints were motivated by animosity toward him.[28]   However, before assessing the merits of the HPS's recommendations, we pause briefly to address Harris's threshold contention that "most" of Count 1 and all of Count 2 are barred by the two-year statute of limitations applicable to disciplinary matters.

### A.      *Statute of Limitations*

Rule 2.14 of the West Virginia Rules of Lawyer Disciplinary Procedure provides:  "Any complaint filed more than two years after the complainant knew, or in the exercise of reasonable diligence should have known, of the existence of a violation of the Rules of Professional Conduct, shall be dismissed by the Investigative Panel."  As to Count 1, Harris argues that Healy B.-N. is the "real party in interest" and knew of the alleged conduct more than two years before Attorney McArdle's March 2017 disciplinary complaint—at least as pertains to the creation of the 2013 trusts and alleged "secreting" of marital assets to Harris by way of "fees" in 2013 through 2015.  Harris argues a complainant cannot artificially extend the statute of limitations by simply later conveying an ethical violation to a mandatory reporter like a member of the bench or bar.  ODC counters that Attorney McArdle is a proper complainant, and the statute of limitations runs from her knowledge of the alleged unethical conduct obtained during the December 16,

---

[28] In addition, Harris levies certain procedural criticisms against ODC and the HPS regarding improperly admitted expert testimony and inadequate witness disclosures, none of which are meritorious.

24

2016, family court hearing; therefore, her complaint a little over four months later was timely filed. We agree.

Although ODC fails to direct us to this case, we find that this Court has previously considered this issue and found that for purposes of Rule 2.14 the actual complainant's knowledge is determinative. In *Lawyer Disciplinary Board v. Smoot*, 228 W. Va. 1, 716 S.E.2d 491 (2010), the Court was tasked with determining the appropriate discipline for a lawyer who improperly withheld a portion of a medical report when submitting it as evidence in a DOL proceeding for black lung benefits. The underlying disciplinary complaint in *Smoot* was initiated upon referral from the United States District Court presiding over a motion for sanctions resulting from the lawyer's conduct. *Id*. at 7, 716 S.E.2d at 497. Like Harris, Smoot argued that the failure to produce the report in its entirety was well known to all affected parties in the litigation more than two years prior to the District Court's referral. *Id*. at 9, 716 S.E.2d at 499. We rejected Smoot's attempted focus on the affected parties' knowledge, finding instead that "[b]ecause the United States district court brought the alleged misconduct to the attention of the ODC, that tribunal is the 'complainant' for purposes of Rule 2.14." *Id*. We noted further that this Court similarly makes referrals to ODC for investigation into potential disciplinary matters appearing during our consideration of a case. *Id*.

As to Count 2, Harris argues that the statute of limitations began to run when Tingler terminated his representation. However, in his brief Harris equivocates as to which

date he contends his termination actually occurred, arguing at various points that his termination was in March 2019 when Tingler sought court-appointed counsel, April 2019 when Attorney Smith was court appointed, or May 2019 when Tingler allowed Attorney Smith to negotiate a plea. ODC counters that Tingler had no knowledge of Harris's misconduct until he received the itemized invoice on February 22, 2020, and therefore his complaint was timely filed on June 24, 2021. Again, we agree; the upshot of Tingler's complaint is the excessiveness of Harris's fee. Tingler's complaint about the reasonableness of Harris's fee cannot reasonably be said to have accrued until he received the itemized statement, file materials, purported fee agreement, and Harris refused to refund the bulk of the retainer. Therefore, we conclude that neither count is barred by Rule 2.14.

## B.    Count 1

As pertains to Count 1, in its brief in support of the HPS's findings, ODC summarily argues that Harris's "course of misconduct" is supported by "substantial evidence" yet dedicates scarcely two pages to this discussion, without citation to the voluminous record. ODC offers conclusory statements that proof of each violation is "evident from the record" alongside a general recap of its witnesses' testimony, dignifying little of Harris's defenses.

Harris defends against the Rule violations found in this count primarily by attempting to relitigate the merits of the competing trust agreements and the family court's

26

equitable distribution—very little of which informs the issue of whether ODC's proof established the specifically charged disciplinary violations. However, despite his preoccupation with relitigating the proceedings giving rise to Count 1, Harris offers one compelling challenge to the HPS's findings: the absence of Healy B.-N.'s testimony. ODC offers little in response, aside from suggesting that Attorneys McArdle and Kelly were competent to testify regarding the facts allegedly developed and adjudicated in the underlying litigation and that *Harris* could have subpoenaed Healy B.-N. to appear at the hearing—an argument that badly misapprehends ODC's burden to prove charges by clear and convincing evidence. *See McGraw*, 194 W.Va. at 789, 461 S.E.2d at 851, Syl. Pt. 1, in part.

As indicated above, our standard of review requires "substantial deference" to the HPS's resolution of factual disputes. *McCorkle*, 192 W. Va. at 290, 452 S.E.2d at 381. However, as the *McCorkle* Court explained, that deference to factual determinations is premised upon the notion that "[t]he [HPS] hears the testimony of the witnesses firsthand and, being much closer to the pulse of the hearing, is much better situated to resolve such issues as credibility." *Id.* (footnote omitted). Where, as here, a key witness who challenges a lawyer's defense to disciplinary charges is absent, the HPS's factual findings are deprived of the benefit of those observations. As a result, our requirement that the HPS's findings be "supported by reliable, probative, and substantial evidence on the whole record" becomes paramount. *Id.*

27

*1. The Summit Proceeds and Hiding of Marital Assets*

We begin with the Summit proceeds and related Main Street Bank account. The HPS found that Harris violated Rules 1.4(a)(1) and 1.4(b) when he "used the personal identification of [Healy B.-N.] to open a bank account in her name" and used the Summit proceeds to pay down Emil N.'s accruing attorney fees—all without Healy B.-N.'s knowledge "according to the complaint and court documents[.]" Before the HPS, Healy B.-N.'s lack of awareness of and/or consent to these transactions was supported only by Attorney McArdle's testimony regarding her own "surprise" at learning of them. Objections to Attorney McArdle offering testimony about Healy B.-N.'s knowledge were properly sustained by the HPS.

ODC addresses the absence of Healy B.-N.'s testimony as to these specific violations by arguing only that the record lacks "clear and convincing" evidence that she *authorized* these transactions—a blatant attempt to shift its burden of proof. Harris is charged with failure to obtain Healy B.-N.'s consent to these transactions, requiring ODC to prove the *absence* of such consent by clear and convincing evidence. Yet the record evidence demonstrates that Harris produced an email to Emil N. and Healy B.-N. confirming that a driver's license was needed to negotiate the Summit check and that it would be used to pay down his attorney fees; it is undisputed that Harris in fact had possession of an expired license Healy B.-N. provided for purposes of a previous real estate transaction. This confirmatory email was consistent with Harris and Emil N.'s testimony that Healy B.-N. was agreeable to utilizing the Summit proceeds for payment of attorney

28

fees—which, notably, were accruing at a time when Harris was ostensibly representing Healy B.-N.'s interests in the criminal investigation as well. Importantly, no witness directly challenged the legitimacy of the email, aside from Attorney Kelly testifying that it had not been produced in any of the underlying litigation. In absence of Healy B.-N.'s testimony that these transactions were not authorized, we find that the ODC failed to establish the Rule violations associated with this transaction by clear and convincing evidence.[29]

Similarly, we find that the more generalized finding by the HPS that Harris conspired with Emil N. to "hide" marital assets suffers equally from the absence of Healy B.-N.'s testimony, as well as a lack of development below. The only testimony that the funds identified by Attorney McArdle were not properly used to pay Harris's fees came from Attorney McArdle—an adversarial litigation position she developed in the divorce proceedings. However, the family court made no finding that these funds were improperly diverted. To the contrary, as reiterated in this Court's memorandum decision affirming the equitable distribution, the family court found that "the parties paid more than $700,000 in attorney's fees and more than $50,000 in investigative costs related to the federal investigation and civil litigation[]" and, critically, concluded that "'recoupment of . . . [these fees and costs] would [be] considered a marital asset subject to equitable

---

[29] Nor do we find Healy B.-N.'s bare-bones affidavit buried within the appendix record sufficient to aid in satisfying ODC's burden. *See supra* nn.6 & 8. This affidavit was neither subject to cross-examination nor lends itself to a credibility determination.

distribution.'" *Emil N.*, 2021 WL 2020296, at *3. Accordingly, the family court attributed $300,000 of the settlement to attorney fees and divided it among the parties, all of which this Court affirmed. *Id.* at *4. Rather than misappropriated, the family court effectively found the attorney fees properly payable, recouped in litigation, and equitably redistributed them to the parties.

Nor was any misappropriation or diversion of marital funds through the trusts established in the declaratory judgment action—an action in which these precise issues were raised and litigated. Healy B.-N.'s pretrial memorandum in the declaratory judgment action identified these issues as requiring resolution at trial, specifically "the nature and amount of each asset diverted from Trust #1 by Paul Harris[,]" "the total value of all assets that were or should have been put into either Trust[,]" and whether "Harris breach[ed] his fiduciary and ethical obligations owed to [Healy B.-N.]" As previously indicated, this action was settled and ODC fails to point us to any factual findings or legal analysis sufficient to resolve these issues.

Moreover, from a practical standpoint, the attorney fee payments challenged by Attorney McArdle were issued years prior to the separation and divorce at a time when Harris suggested he was also representing Healy B.-N.'s interests in regard to the federal investigation. ODC provides no explanation as to why these transactions should be construed as attempts to "hide" marital assets years before the parties separated or instituted divorce proceedings, or why Healy B.-N. would object to payment of attorney fees

30

accruing for Harris's successful defense of Emil N. and, ostensibly, her. In fact, the record contains a July 2013 check payable to "Harris Law" in the amount of nearly $150,000 drawn on the parties' joint account and executed by Healy B.-N. herself. ODC's failure to present Healy B.-N.'s testimony leaves these questions unanswered and these isolated documents without context or explanation. The HPS's recommended decision likewise offers no analysis of the evidence leading to this conclusion, but merely a recap of the testimony offered by each witness.

In the proceedings below ODC relied heavily on the aggregated "outgoing" payments from Harris to Emil N. to tie the attorney fee payments to the scheme alleged in the Statement of Charges. ODC made much of Emil N. and Harris's nebulous testimony regarding the loan to Harris's cousin and the funneling of that alleged loan repayment to Emil N. through Harris's operating account. In fact, to further heighten the suspicious nature of these payments, ODC ardently took the position before the HPS that Harris had failed to disclose these transactions and other business relationships with Emil N. in response to ODC's written inquiries.

Although we share skepticism regarding Emil N. and Harris's testimony about these payments—and the unexplained peculiarity of these alleged "loan repayments" running through Harris's operating account—we observe that this loan and the payments to Emil N. were not conjured for purposes of these proceedings. These transactions were disclosed in the divorce proceedings, as confirmed by this Court's discussion of them in

31

*Emil N.*[30]  Moreover—despite ODC's disingenuous protestations—*all* of these matters were disclosed by Harris in his July 13, 2021, sworn statement to ODC contained in the appendix record. During that sworn statement, ODC extensively inquired of Harris about potential conflicts with "[Emil N.'s] companies that [Harris] created loaning money to [Harris's] relatives," and the ownership of the LLCs described by Harris and Emil N. below.  ODC fails to provide evidence that the loan or any of the outgoing payments to Emil N. did not comport with their explanation and fails to direct us to any subsequent written demand for supporting documentation regarding these issues or Harris's refusal to provide it.[31]

To that end, we observe that Attorney McArdle's complaint alleging this scheme was filed in March 2017 and the evidentiary hearing below occurred *nearly seven years later.*  ODC's attempt to gap-fill holes in its evidence with disingenuous accusations of failure to disclose information critical to its proof, when it had almost seven years to develop any and all information necessary to prove the charges, is as inexcusable as it is

---

[30] Our discussion of the facts states:  "[P]etitioner had invested $600,000 of the settlement proceeds into an entity (99% of which was owned by petitioner), which had then loaned the money to another corporation. Petitioner received interest-only payments on that loan of $8,500 per month[.]"  *Emil N.*, 2021 WL 2020296, at *2.

[31] In the proceedings below, ODC repeatedly demanded that Harris identify when he disclosed "at any time" his joint property ownership with Emil N. or that Harris's cousin "took a $600,000 loan from [his] client[.]"  The sworn statement very plainly discusses the LLCs—one of which "bought property" and the other of which "loaned money"; Harris testified that he "had one percent or something" of the LLC(s) and was the managing member.  Harris further confirmed that one LLC "loaned $600,000 to a restaurant" that was "owned and controlled" by his "cousin by marriage."

inexplicable. Harris and Emil N.'s testimony regarding these payments, albeit questionable, stands unrebutted. Accordingly, we find that the scheme to hide marital assets alleged by ODC lacks sufficient development and evidentiary support to clearly and convincingly establish the three associated Rule violations found by the HPS.

### 2. *The Declaratory Judgment Action*

Turning to the allegations regarding the declaratory judgment action, the HPS found that Harris's filing of the action created conflicts of interest under Rules 1.7 and 1.9(a) and that, as trustee, he violated various duties by failing to facilitate the settlement. Harris characterizes the filing of a declaratory judgment action as a non-partisan request for "guidance on what [trust agreements] mean or are they valid" and argues that he merely presented the issue for resolution by the court consistent with his understanding of the facts. As for his conduct as trustee, Harris emphasizes that he complied with the court's disqualification order, ultimately resigned as trustee, and lacked the opportunity to challenge the accusations against him in the context of that matter. Importantly, in support of these violations, both ODC and the HPS's recommendation rely almost exclusively on the findings and conclusions in the disqualification and trustee removal orders entered in the declaratory judgment action, as reiterated during Attorney Kelly's testimony.

Like the allegations regarding Harris's involvement in Emil N. and Healy B.-N.'s marital assets, we find that the evidence surrounding the declaratory judgment action

33

was incompletely developed or otherwise inadequately supports the HPS's findings, particularly in the absence of Healy B.-N.'s testimony; accordingly, those findings cannot be adopted. With respect to the violations of Rule 1.7 (conflict with *current* client) and 1.9(a) (conflict with *former* client), the HPS's findings adopt wholesale the circuit court's conclusion that by filing the declaratory judgment action Harris "was essentially representing *himself* and [Emil N.], a former *and or* current client, against *himself*, as Trustee, and the interests of beneficiary [Healy B.-N.], a former *and or* current client[.]" This obstruse language is taken directly from the disqualification order, but contains no supporting factual findings regarding Harris's evolving and multi-faceted representation of each of the parties, aside from the conclusory finding that Harris "represented and/or continues to represent one or both of the Respondents[.]" The phrasing of these conclusions in the alternative alone demonstrates their inadequacy.

With regard to his representation of Emil N. and Healy B.-N., Harris testified and provided supporting documentation that he withdrew from representation of Healy B.-N. in her various unrelated lawsuits in 2016, before the filing of the declaratory judgment action. With respect to the preparation of the trusts in particular, Harris affirmatively disavowed an attorney-client relationship with Healy B.-N. *Cf. Law. Disciplinary Bd. v. Hussell*, 234 W. Va. 544, 549, 767 S.E.2d 11, 16 (2014) ("If . . . there was not an attorney-client relationship at certain relevant times, the charges cannot be sustained."). And while the litigation below evinces Healy B.-N.'s contrary position, the sworn testimony offered in these proceedings reflects only Harris and Emil N.'s unrebutted contention—as

34

corroborated by Harris's two investigators—that she disavowed participation in the trust arrangement. It is well-established that "an attorney-client relationship begins '[a]s soon as the client has expressed a desire to employ an attorney[,] and there has been a corresponding consent on the part of the attorney to act for him in a professional capacity[.]'" *Id*. at 549, 767 S.E.2d at 16 (quoting Syl. Pt. 1, in part, *Keenan v. Scott*, 64 W.Va. 137, 61 S.E. 806 (1908)).

Despite Healy B.-N. plainly not being a "current" client of Harris's at the time of the declaratory judgment action, neither the circuit court's order—upon which ODC exclusively relies—nor the HPS's recommendation conducts an analysis of the language of Rule 1.9 regarding conflicts of interest with "former" clients or the factors outlined by this Court to support disqualification in that instance. It is insufficient to simply declare them collectively "former and/or current" clients to whom Harris cannot be "adverse." The language of the Rule 1.9(a) requires an examination of whether there was former representation in the "same or substantially related matter." Further, this Court has held:

> To disqualify an attorney pursuant to Rule 1.9(a) of the West Virginia Rules of Professional Conduct, five criteria must be satisfied: (1) the existence of an attorney-client relationship between the attorney and the former client; (2) the existence of an attorney-client relationship between the attorney and the subsequent client; (3) the subject matter of the subsequent client's representation either is the same as or is substantially related to the subject matter of the former client's representation; (4) the subsequent client's representation is materially adverse to the interests of the former client; and (5)

35

the former client has not consented, after consultation, to the subsequent representation.

Syl. Pt. 5, *State ex rel. Bluestone Coal Corp. v. Mazzone*, 226 W. Va. 148, 151, 697 S.E.2d 740, 743 (2010); *see also* Syl. Pt. 3, *State ex rel. McClanahan v. Hamilton*, 189 W. Va. 290, 430 S.E.2d 569 (1993) (holding that proof of a Rule 1.9(a) violation "requires an analysis of the facts, circumstances, and legal issues"). The circuit court's order ostensibly *presumes* that Harris represented Healy B.-N. with respect to the trust despite the fact that her involvement with the trust preparation was the central dispute in the declaratory judgment action.

Similarly, the circuit court failed to conduct the necessary analysis required under Rule 3.7. Our caselaw requires that where disqualification is premised on an attorney as witness, the court is required to examine several factors including whether "the evidence can[] be obtained elsewhere[.]" Syl. Pt. 3, in part, *Smithson v. U.S. Fid. & Guar. Co.*, 186 W. Va. 195, 411 S.E.2d 850 (1991). Aside from summarily declaring Harris the "most important witness" the circuit court failed to evaluate any factors identified in our caselaw or, more importantly, the language of Rule 3.7 itself, which provides for several exceptions including where disqualification "would work substantial hardship on the client."

It is therefore apparent that these allegations are mired in unresolved factual issues pertaining to the creation of the trusts at issue; however, there are also complex unresolved legal issues at play regarding trust administration and a trustee's commensurate obligations. Harris correctly notes that West Virginia Code § 55-13-4 (2016) permits

36

*"[a]ny person interested as* or through an executor, administrator, *trustee*, guardian or other fiduciary, creditor, . . . in the administration of a *trust*" to have a "declaration of rights or legal relations in respect thereto[.]" (Emphasis added). ODC fails to offer or direct us to any legal analysis regarding the express authority granted a trustee under this statute, the role of lawyer as trustee, and our Rules pertaining to conflicts of interest. In sum, had the circuit court undertaken *any* of the required factual and legal analysis as required by our caselaw, its findings may have provided adequate support for the purported Rule violations alleged in this aspect of Count 1. However, we cannot and will not resolve those issues in the first instance on the record as presented. As a result of the foregoing, we find that ODC failed to establish the Rule violations associated with the filing of the declaratory judgment action.

Finally, regarding the alleged Rule violations involving Harris's conduct as trustee, we find them inapposite to the circumstances. The HPS's recommendation finds summarily that Harris "engaged in dilatory conduct *as the Trustee* in complying with the Settlement Agreement," ostensibly on the basis of Attorney Kelly's testimony and the order removing him as trustee. (Emphasis added). Accordingly, the HPS found violations of Rules 1.3 and 3.2—which describe the duties of diligence and expedition of litigation a lawyer owes to his *client*.[32] However, at the time of his alleged dilatory conduct, Harris

---

[32] *See* Rule 1.3 ("A lawyer shall act with reasonable diligence and promptness in representing a *client*." (emphasis added)) and Rule 3.2 ("A lawyer shall make reasonable efforts to expedite litigation consistent with the interest of the *client*." (emphasis added)).

was not acting on behalf of *any* client, but solely as trustee; all the alleged conduct occurred after he was disqualified from acting as counsel in the matter, requiring the trust to secure alternate counsel.

While lawyers serving as trustees or providing other "law-related services" are no doubt subject to our Rules pursuant to Rule 5.7, ODC fails to explain how a lawyer in that circumstance violates a duty to his *client* when he has none.[33]  Similarly, Rule 3.4(c) entitled "[f]airness to [o]pposing [p]arty and [c]ounsel[]" prohibits "knowingly disobey[ing] an obligation under the rules of a tribunal[.]"  Like Rules 1.3 and 3.2, this Rule also implicitly speaks to a lawyer's conduct in representation of a *client* by referencing "opposing party and counsel."  Regardless, neither ODC nor the record clearly demonstrate what tribunal rule Harris allegedly violated.  We are further struck by the fact that the allegations against Harris for failure to facilitate the settlement terms to the satisfaction of the parties describes a relatively commonplace litigation dispute that was resolved within the confines of the litigation itself.

---

[33] Rule 5.7 subjects lawyers providing "law-related services" to the Rules under certain circumstances; ODC makes no reference to this Rule, nor does the Statement of Charges allege that Harris's violations occurred in the course of providing "law-related services."  This Rule "is intended to prevent a user of the law-related services from both believing that an attorney-client relationship exists between the user and the provider and, because of that relationship, from assuming that all of the protections inherent in such relationship apply[.]"  John K. Villa, *Wearing Two Hats - The Ethical Conundrum of the Lawyer Acting in A Business Capacity*, 27 No. 9 ACC Docket 118, 119 (Nov. 2009).  Given that all parties were represented by separate counsel in the litigation pertaining to the trust, there was little chance a "user" of Harris's "trustee services" required the protection of this Rule.

In that regard, our determination regarding the conduct at issue in Count 1 is necessarily influenced by the fact that *all* of these allegations were subject to—and presumably resolved within—the adversarial process. The diversion of marital assets was plainly a matter before the family court and presumptively resolved by its equitable distribution, which was appealed to this Court and affirmed. Additionally, the issues involving the formation of the trusts and any associated fraud or breaches of duty were matters raised in the context of the declaratory judgment action, which was likewise resolved. *See* discussion *supra*. And while by no means do we suggest that lawyers are immune from disciplinary charges for conduct occurring in the course of or subject to litigation, that forum is frequently better suited to address alleged "misconduct" that is inextricably intertwined with the merits of the litigation itself.

Finally, with respect to Count 1, ODC endeavored to establish serious allegations of misconduct originating in cases which were extensively litigated, but which failed to yield well-substantiated findings on issues critical to the ethics charges. ODC then failed to secure the testimony of the primary affected party whose testimony was critical to establishing the pertinent elements of the alleged Rule violations. Instead, it introduced hundreds of documents and surrogate testimony from lawyers regarding expedient litigation positions as though they were adjudicated and established facts. And while our review is plenary, it is not the role of this Court to sort through an avalanche of evidence in an effort to marshal sufficient proof to sustain ODC's burden. Accordingly,

we find that ODC failed to prove the Rule violations alleged in Count 1 by clear and convincing evidence and therefore reject the HPS's findings in that regard.

## C.    *Count 2*

Turning now to Count 2, Harris argues that Tingler's complaint constitutes nothing more than a fee dispute and is undeserving of discipline. He contends that Tingler admitted he believed his fees would be at least $50,000, which Harris's expert testified was a reasonable sum. He further argues that "non-refundable flat fee[s]" for criminal cases are commonplace and earned upon receipt. He contends that our Rules are silent on the precise handling of such fees; therefore, any alleged violation in that regard cannot be grounds for discipline.[34]

ODC argues that the evidence demonstrates that Tingler did not agree to any sort of "flat fee" arrangement with Harris and that regardless, Harris failed to earn his fee. And while ODC apparently concedes that designating a flat fee as "earned upon receipt" may be permissible if "the client agrees to this arrangement[,]" it argues that in absence of such agreement, the fees should have been treated as advanced fees, remaining in Harris's

---

[34] Specifically, Harris urges that in lieu of discipline, our Rules should instead be changed to address any policy concerns regarding non-refundable flat fees. *Cf. In re Kendall*, 804 N.E.2d 1152, 1156-57 (Ind. 2004) (noting lawyer's argument that modification of Rules regarding flat fees should be "undertaken only as part of our rulemaking process, with extensive input from the public and the bar, rather than in this case."). We agree that any modification or clarification of our Rules in this particular instance is better managed through our rule-making process, subject to public comment. However, because we find that Harris violated well-established Rules regarding the handling of advanced legal fees, this presents no impediment to these proceedings.

trust account until corresponding work was performed.[35]  Accordingly, it argues that Harris

plainly violated Rules requiring reasonable fees, written fee agreements and safekeeping

of client funds, along with additional violations of Rule 8.4.

The parties' briefing suggests that this issue rises and falls with the debatable

legal issue of whether "flat fees" are earned on receipt or whether they are merely "advance

payments" of fees by another name.  ODC and Harris actively engage in a semantical tug

of war regarding whether his fee constituted an "advance payment retainer," "non-

refundable retainer," or "flat fee"—all without adequate analysis of how these concepts

differ, if at all, or the more nuanced discussion of how each is treated under our Rules.

These parties are not the first to rebrand a fee arrangement in a manner conducive to their

position.  "The questionable ethical viability of non-refundable fee advances has inspired

some imaginative terminology designed to characterize the advance payments in a manner

that eludes the issue: retainers, non-refundable retainers, fee advances, or advanced fees,

---

[35] ODC also repeatedly emphasizes Harris's use of a "series of safes" as non-compliant with the Rules regarding safekeeping of client funds; however, the Statement of Charges contains no charges regarding this practice, nor did ODC request the HPS or this Court to find any additional uncharged violations. *See* Syl., in part, *Law. Disciplinary Bd. v. Stanton*, 233 W. Va. 639, 760 S.E.2d 453 (2014) ("[A] lawyer may be disciplined for an uncharged rule violation if the uncharged violation is within the scope of the misconduct alleged in the formal charge, and if the lawyer is given: (1) clear and specific notice of the alleged misconduct supporting the uncharged rule violation; and (2) an opportunity to respond.").

prepaid fees, *flat fees*, and minimum fees." *Iowa Sup. Ct. Bd. of Pro. Ethics & Conduct v. Apland*, 577 N.W.2d 50, 55 (Iowa 1998).[36]

We observe that there is widespread disagreement about whether so-called "nonrefundable" retainers or fees should be prohibited in their entirety, given the near-universal requirement that all fees must be earned. *See In re Cooperman*, 633 N.E.2d 1069, 1072 (N.Y. 1994) (holding that nonrefundable retainers are per se unethical). Many courts have found that "flat fees" are actually "advance payment" retainers in disguise, requiring a draw down as fees are earned. *See, e.g., In re Mance*, 980 A.2d 1196, 1202 (D.C. 2009), *as amended* (Oct. 29, 2009) ("[W]hen an attorney receives payment of a flat fee at the outset of a representation, the payment is an 'advance[] of unearned fees'"). Still other courts have declared such fees a permissible, negotiated fee arrangement between lawyer and client to be earned and withdrawn as agreed. *See, e.g., In re Connelly*, 55 P.3d 756, 761-62 (Az. 2002) ("A non-refundable flat fee reflects 'a negotiated element of risk sharing between attorney and client'" but "'must be carefully examined on its own facts for reasonableness.'" (quoting *In re Hirschfeld,* 960 P.2d 640, 643 (Az. 1998))). Not surprisingly, these various distinctions create disparate positions as to the proper handling of such fees:

---

[36] *See also* Lester Brickman & Lawrence A. Cunningham, *Nonrefundable Retainers Revisited*, 72 N.C. L. Rev. 1, 32 n.121 (1993) (referring to a "lump sum fee" as "a variant of the nonrefundable retainer"); Alec Rothrock, *The Forgotten Flat Fee: Whose Money Is It and Where Should It Be Deposited*? 1 Fla. Coastal L.J. 293, 299 (1999) (referring to fixed or flat fee as "a close relative of the nonrefundable retainer[]").

> It is said to be the majority rule that lawyers may, with client consent—typically confirmed in writing—treat flat fees as earned upon receipt and therefore not entrusted. A substantial minority of jurisdictions, however, hold that because flat fees are merely advance fee payments, they must be held in trust until earned through the lawyer's performance of the agreed services.

Douglas R. Richmond, *Understanding Retainers and Flat Fees*, 34 J. Legal Prof. 113, 132 (2009) (footnotes omitted).[37]

It is apparent that our presently constituted Rules of Professional Conduct do not outright prohibit "nonrefundable retainers" or "flat fees." One informal opinion from our Lawyer Disciplinary Board acknowledges that "use of fixed or 'flat' fee arrangements does not constitute a *per se* violation of the Rules of Professional Conduct[]" but cautions that not "all fixed or flat fee arrangements are acceptable."[38] Yet another informal opinion from the Lawyer Disciplinary Board recommends that attorneys "avoid the concept of 'non-refundable retainers[,]'" reminding that "[a]ll fees must be earned." L.E.I 99-03, *Non-Refundable Agreements*. Despite discouraging such agreements, however, the Lawyer Disciplinary Board acknowledges their use, cautioning that "[a]ny agreement concerning non-refundable retainers must be written and explained to the client and must

---

[37] *See also* Rothrock, *supra*, at 300 (outlining three views nationwide: 1) flat fees are not "funds of clients" and therefore may be placed into operating account; 2) by agreement, flat fees may be considered earned on receipt and placed into operating account; and 3) all flat fees must be entrusted).

[38] L.E.I. 98-01, *Fixed or 'Flat' Fee Arrangements for Insurance Defense Work*.

meet the reasonableness test of Rule 1.5." *Id.*[39]  Suffice it to say, under our Rules all fees—

regardless of their branding—must be reasonable, must be earned, and must be clearly

explained to the client in writing.  *Accord* Restatement (Third) of the Law Governing

Lawyers § 38 (2000) ("A client and lawyer might also agree that an advance payment is

neither a deposit nor an engagement retainer, but a lump-sum fee constituting complete

payment for the lawyer's services. Again, the lawyer must adequately explain this to the

client.  In any event, an engagement-retainer or lump-sum fee must be reasonable[.]").

To that end, we find it unnecessary for purposes of this case to delve into the

policy considerations underlying nonrefundable retainers or flat fees.  We find that

Harris—in all respects—treated Tingler's retainer as an advance payment of fees, bringing

his conduct squarely within the express requirements of our Rules rather than any purported

gray area surrounding nonrefundable retainers or flat fees.  Rule 1.15(c) requires that a

lawyer deposit "legal fees and expenses that have been paid in advance" into a trust account

and permits withdrawal "only as fees are earned or expenses incurred."  Despite claiming

that he believed his fee to be earned upon receipt, Harris placed the fee into his IOLTA

---

[39] *Accord In re Connelly*, 55 P.3d 756, 761 (Az. 2002) ("[N]on-refundable retainers are not per se violations . . . and 'a flat fee charged for specific legal services can be proper.' . . . . We have also explained that '[r]egardless of how [a] fee is characterized . . . each [fee agreement] must be carefully examined on its own facts for reasonableness.'" (citations omitted)); *see also* Robert L. Rossi, 1 Attorneys' Fees § 1:3, *Types of retainers—Nonrefundable retainers* (3d ed., 2024) ("[A] flat fee or a minimum fee charged for specific legal services may also be proper.  However, it has been recognized that fee agreements do not always fit neatly into a particular category[.] . . . One approach is to simply examine the facts of each situation for reasonableness regardless of how the fee is characterized." (footnotes omitted)).

account, thereby commingling it with other client funds. Then, rather than withdrawing the fee in its entirety, he drew down against it periodically (albeit frequently and until depleted) in "round number" lump sums by way of telephone transfers. When asked expressly about the telephone transfers, Harris explained, "That's when money is earned, and we keep track of all of those issues." However, those transfers bore no apparent relationship to any work performed and, again, as incremental withdrawals, fly in the face of Harris's contention that the fee was earned in its entirety upon receipt, and nonrefundable. [40]

Like the HPS, we find that the reliable and probative evidence supports Tingler's testimony that he believed the $50,000 a mere starting point for his defense and therefore, an advance payment of fees. Accordingly, we agree with the HPS's finding that Harris violated Rules 1.15(a) and 1.15(b) prohibiting commingling of attorney and client funds. Further, by treating Tingler's retainer as an advanced payment, Harris's failure to refund amounts after termination for which he did not purport to perform itemized work violates Rule 1.16(d), requiring return of unearned, advanced fees upon termination.

---

[40] Not only does the evidence fail to support Harris's contention that Tingler's retainer was a non-refundable "flat fee," it likewise did not represent payment for Harris's "availability," as he argued before the HPS. A retainer paid for a lawyer's "availability" is commonly known as a "general retainer" and differs significantly from the alleged "flat fee" at issue herein: "General retainers are paid as consideration for a lawyer's employment, *rather than for services rendered*. . . . A general retainer is deemed to be earned when paid, and it immediately becomes the lawyer's property." Richmond, *supra,* at 115-16 (footnotes omitted) (emphasis added).

Consequently, it is further apparent that Harris failed to properly communicate the fee in writing in violation of Rule 1.5(b). Tingler consistently maintained that he was unaware of any fee agreement, much less one outlining a "flat fee." And while Harris is correct that a non-contingent fee agreement need not be signed by the client, his failure to produce a signed agreement is supportive of Tingler's claim that he did not agree to a non-refundable flat fee. Clearly, the HPS did not find Harris and his investigators' testimony that Tingler executed the agreement credible, and we find no reason to strip that finding of the "substantial deference" that it is owed. *See* Syl. Pt. 3, *McCorkle*, 192 W. Va. 286, 452 S.E.2d 377. More importantly, however, even if the agreement were acknowledged by Tingler, it states merely that the fee is a "fixed fee" without explanation of what that means, when and how it is earned, or any reference to it being "non-refundable." *See In re Sather*, 3 P.3d 403, 410-11 (Colo. 2000), *opinion modified on denial of reh'g* (June 12, 2000) (holding unless fee agreement explains fee is earned upon receipt, it is presumed to be advanced fee).

We likewise agree with the HPS's conclusion that Harris's fee was unreasonable in violation of Rule 1.5(a). Despite generating a detailed invoice purportedly justifying his retention of the $50,000 fee, Harris admittedly performed no expected or necessary threshold tasks like contacting Attorney Smith or the U.S. Attorney's office. Further, Harris repeatedly characterized his fee as reasonable for the *trial defense* of federal tax charges. However, there is no indication that Tingler's case was ever close to trial, nor does Harris's invoice reflect the type and amount of activity that would be expected for a

46

federal criminal tax fraud case approaching trial.  We agree with the general proposition that "[a] flat fee for which little or no work is done is by definition unreasonable[.]" Richmond, *supra*, at 133.

That said, we are careful to contrast Harris's conduct with those cases in which a lawyer's failure to perform necessary and expected work is the result of neglect or other factors.  Like the HPS, we find Harris's conduct in regard to his fee reflective of deceit, and therefore violative of Rule 8.4(c).  Our review of the record leads us to the inescapable conclusion that Harris engineered billing entries and file materials designed to justify retention of the entirety of the fee.  His contention that despite failing to perform threshold, rudimentary tasks, he found it proper and necessary to begin assembling jury instructions lacks credibility.  Further, his testimony that Tingler's case was unusual and necessitated startling amounts of legal research was contradicted by Attorney Smith, who found the case "straightforward"; indeed, Attorney Summers' observation that the bound manuals and regulations were essentially pristine and included for appearance's sake is consistent with this testimony.[41]  Even Harris's delay in providing Tingler the itemized bill

---

[41] Moreover, our review of the itemized invoice reveals that it is replete with essentially unverifiable large blocks of time dedicated to non-specific tasks such as "conferences regarding case" or "case review."  Other irregularities on the invoice include a February 20, 2019, payment of $4,020.43 for investigative expenses.  However, the investigator's invoice reflects a balance due of only $520.43 after deduction of an October 2017 retainer of $3,500—which is nowhere reflected on Harris's itemization.  Further, Harris's corroborative entry for "Email Fee Agreement to Investigator Street for hand delivery to client" stands out as his most markedly descriptive entry on the bill—yet no copy of any such email was contained in the file materials.  Finally, not only is the gross amount of legal research facially excessive, the individual billing entries for "legal

casts further doubt on the veracity of its contents. Upon Tingler's request for an itemized invoice in February 2020, Harris claimed he was awaiting Attorney Williams' invoice; however, Harris's own itemization reflects that he had paid Attorney Williams' invoice nearly two years earlier.

Accordingly, we agree with the HPS's conclusion that Harris's conduct in this regard is violative of Rule 8.4(c)'s prohibition on deceitful conduct. Moreover, because Harris's retention and consumption of Tingler's retainer—despite doing little to no work—caused Tingler to require court-appointed counsel at taxpayer expense, we agree that his conduct was also prejudicial to the administration of justice in violation of Rule 8.4(d).

And finally, while we agree that Harris's conduct reflected deceit, we find that ODC failed to establish that Harris violated Rule 8.4(b), which requires proof that a lawyer "commit[ed] a *criminal* act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects[.]" (Emphasis added). Here, neither ODC nor the HPS identify what crime Harris allegedly committed relative to the fee. We

---

research" in increments of seven, eight and nine hours reflect entire workdays dedicated to legal research for a case Attorney Smith stated was "not . . . complicated" and of a type which Harris claimed to have successfully handled for years. *See* Restatement (Third) of the Law Governing Lawyers § 34 cmt. f (2000) (discussing discipline for unreasonable fees where there is "evidence demonstrating the lawyer's gross insensitivity to broadly accepted billing standards.").

have previously rejected a Rule 8.4(b) violation in a similar case involving mishandling of IOLTA funds for the same deficiency:

> [N]othing in the record supports the Subcommittee's conclusion that Haught violated Rule 8.4(b) of the *Rules of Professional Conduct*. That Rule sets forth an ethics violation for the commission of a criminal act. Neither the Statement of Charges nor the Subcommittee's Report and Recommendation identified any criminal act allegedly committed by Haught, and the record contains no evidence of such a violation.

*Law. Disciplinary Bd. v. Haught*, 233 W. Va. 185, 194, 757 S.E.2d 609, 618 (2014). We therefore find that only seven of the eight Rule violations found by the HPS were established by clear and convincing evidence as to Count 2.

### D.      Sanctions

Having found seven violations of the Rules of Professional Conduct in regard to Count 2, we turn now to the appropriate sanction. Because the additional fifteen violations in Count 1 were not proven by clear and convincing evidence, it is self-evident that the HPS's recommendation of annulment of Harris's law license likely no longer presents a proportionate sanction. We are of course guided by the factors established in Rule 3.16 of the Rules of Lawyer Disciplinary Procedure, as reiterated in Syllabus Point four of *Jordan*, 204 W.Va. 495, 513 S.E.2d 722. *See supra* n.26.

With respect to these factors, we agree generally with the HPS's statement that safekeeping of client funds is one of the most serious duties imposed upon a lawyer. We find it significant that Harris's retention and consumption of Tingler's retainer without

49

earning his fee caused Tingler to require public funds to pay for his defense. As such, Harris's mishandling of the fee violated duties not only to his client, but to the public, the legal system, and the profession. And notwithstanding our acknowledgment of the lack of widespread uniformity in handling of "flat fees" or "nonrefundable retainers," we do not hesitate to find intent, rather than negligence, in Harris's conduct: the Rule violations committed by Harris were not grounded in uncertainty about our Rules, but rather were borne of the type of intentional fee-gouging they were designed to prevent. Harris collected a fee, performed little to no work to earn it, periodically dipped at will into the funds—which were being housed with other client funds—and then attempted to engineer file materials and billing entries to justify it.

That said, however, we reject any suggestion by ODC or the HPS that Harris's conduct in regard to the Tingler fee constitutes the type of "misappropriation" or "conversion" of client funds we have previously found warranting the harshest of sanctions: annulment. At the heart of the Tingler complaint is an unreasonable and mishandled fee. And although we acknowledge that Harris's conduct smacks of intentional fee-gouging, the cases relied upon by ODC supporting annulment for "knowing misappropriation" of client funds involve conversion of undisputed client monies held in trust—such as settlement funds or sale proceeds—rather than amounts designated and disputed as fees. *See, e.g. Law. Disciplinary Bd. v. Greer*, No. 23-82, ___ W. Va. ___, ___ S.E.2d ___, 2024 WL 4784407, at *2 (W. Va. Nov. 14, 2024) (conversion of client partition sale proceeds held in trust and admission by lawyer that he "mishandled his IOLTA

50

account for many years"); *Law. Disciplinary Bd. v. Brown*, 223 W. Va. 554, 678 S.E.2d 60 (2009) (lawyer used settlement monies intended for subrogation claims for own use); *Law. Disciplinary Bd. v. Duty*, 222 W. Va. 758, 671 S.E.2d 763 (2008) (lawyer opened checking account with client settlement monies instead of placing into trust); *Law. Disciplinary Bd. v. Coleman*, 219 W. Va. 790, 639 S.E.2d 882 (2006) (lawyer invoiced firm bond work to clients directing payment to his own personal account rather than firm); *Law. Disciplinary Bd. v. Wheaton*, 216 W. Va. 673, 610 S.E.2d 8 (2004) (disbursement of settlement proceeds held in trust returned for nonsufficient funds resulting in felony worthless check charges against lawyer).[42]

Instead, we find that the following cases involve the most similar underlying conduct and adjudicated Rule violations. In *Lawyer Disciplinary Board v. Morgan*, 228 W. Va. 114, 717 S.E.2d 898 (2011), we issued a one-year suspension based upon four counts where the lawyer accepted retainers for work not performed and directly deposited them into his operating account. *Id*. at 117, 717 S.E.2d at 901. We agreed that such conduct was violative of Rules 1.5(a), 1.15(a), 1.16(d), 8.4(c) and (d). *Id*. at 119, 717 S.E.2d at 903. Similarly, in *Haught*, 233 W. Va. at 185, 757 S.E.2d at 609, we issued a one-year

---

[42] *See also Law. Disciplinary Bd. v. Kupec*, 202 W. Va. 556, 505 S.E.2d 619 (1998) (conversion of sale proceeds of property held in trust account for expenses); *Comm. on Legal Ethics of the W. Va. State Bar v. Lambert*, 189 W. Va. 84, 428 S.E.2d 65 (1993) (settlement check forged by lawyer and other client settlement checks returned for insufficient funds); *Comm. on Legal Ethics of W. Va. State Bar v. Pence*, 161 W. Va. 240, 240 S.E.2d 668 (1977) (lawyer repeatedly placed settlement funds into personal account and immediately withdrew funds for own use).

suspension based on a lawyer's immediate withdrawal of client funds from an IOLTA account, violating Rules 1.15(a) and 8.4(c) and (d). *Id*. at 187, 757 S.E.2d at 611. Finally, in *Lawyer Disciplinary Board v. Thorn*, 236 W. Va. 681, 783 S.E.2d 321 (2016), we issued a one-year suspension for multiple counts involving "non-refundable, so-called 'flat fee' retainers" where funds were placed into operating, rather than IOLTA, accounts and no work performed, resulting in violations of Rules 1.15(b), 1.16, and 8.4(c). *Id*. at 684, 783 S.E.2d at 324.

With a relatively uniform one-year suspension as our baseline, we consider whether there are aggravating or mitigating factors requiring variance. We agree with the HPS's conclusion that Harris's substantial experience in the practice of law and two prior Rule 1.15 admonishments are obviously aggravating. And while we do not consider disciplinary matters that are closed without sanction as aggravating, we would be remiss if we did not acknowledge the express warnings previously issued to Harris by the Lawyer Disciplinary Board for his fee practices in other highly similar complaints. In response to Harris's identical defense that a disputed fee constituted a "non-refundable flat fee," the Board cautioned Harris that "[a]ll fees must be reasonable, including so called non-refundable retainers and 'flat fees.' . . . . Non-refundable agreements must be written, explained to the client <u>and</u> meet the reasonableness test of Rule 1.5[.]" *See also* Restatement, *supra*, § 34, cmt. f (recognizing "previous warnings to the lawyer" as grounds for discipline). Given his two prior admonishments and these express warnings, we find Harris's prior disciplinary record markedly aggravating.

As previously discussed, we likewise agree with the HPS that Harris's conduct reflected a dishonest or selfish motive: "Courts have applied the aggravating factor of dishonest or selfish motives in cases where the lawyer intends to benefit financially from prohibited transactions." *Law. Disciplinary Bd. v. Sirk*, 240 W. Va. 274, 282, 810 S.E.2d 276, 284 (2018). Although not tantamount to misappropriation or conversion of undisputed client monies, there is little question that the circumstances presented herein reflect Harris's intent to fee-gouge Tingler for Harris's financial gain.

However, we also find one additional aggravating factor not articulated by the HPS: lack of remorse. Harris's defense of Count 2 culminated in threatening Attorney Summers with a lawsuit if a complaint was filed. Before this Court, Harris attempted to discredit Tingler by repeatedly referencing his "multiple felony convictions." Even his belated refund of a small portion of the retainer was characterized as a "courtesy," rather than an obligation under the Rules. Upon this record, we have little difficulty finding Harris's lack of remorse a significantly aggravating factor. *See Law. Disciplinary Bd. v. Hart*, 235 W. Va. 523, 536, 775 S.E.2d 75, 88 (2015) (finding aggravating lawyer's "propensity for accepting and keeping retainer fees for work which he did not perform[,]" failure to return fees, and noting client had to sue to obtain settlement funds owed).

Along with these considerations, we are reminded that

> [i]n deciding on the appropriate disciplinary action for ethical violations, this Court must consider not only what steps would appropriately punish the respondent attorney, but also whether the discipline imposed is adequate to serve as an

53

> effective deterrent to other members of the Bar and at the same time restore public confidence in the ethical standards of the legal profession.

Syl. Pt. 3, *Comm. on Legal Ethics of W. Va. State Bar v. Walker*, 178 W.Va. 150, 358 S.E.2d 234 (1987). Accordingly, we find a two-year suspension an appropriate sanction. However, as a further limitation on any future practice, as we have in other similar cases, we find it appropriate to require additional safeguards. In *Morgan*, in addition to a one-year suspension, the Court ordered restitution and a two-year requirement that the attorney have his trust account audited. 228 W. Va. at 125, 717 S.E.2d at 909*; see also In re Reinstatement of Wheaton,* 245 W. Va. 199, 208, 858 S.E.2d 662, 671 (2021) (requiring three years annual auditing). Therefore, should Harris be reinstated to the practice of law, we find it appropriate to require him to secure, at his own expense, a certified public accountant to perform annual audits of the accounts associated with his practice for a period of three years, and to provide those audits to ODC.

Finally, we are concerned that despite finding that Harris charged an unreasonable and in fact "criminal" fee, the HPS failed to order any restitution to Tingler. *See* W. Va. R. Law. Disciplinary P. 3.15 (permitting restitution as permissible sanction).[43] We find that Harris's conduct in regard to Tingler's case and fee renders all but those sums

---

[43] *See also* Syl. Pt. 5, *Law. Disciplinary Bd. v. Ball*, 219 W. Va. 296, 633 S.E.2d 241 (2006) (outlining considerations for forfeiture of fee as a result of misconduct including "(1) the gravity and timing of the violation, (2) its willfulness, (3) its effects on the value of the lawyer's work for the client, (4) any other threatened or actual harm to the client, and (5) the adequacy of other remedies.").

payable to his investigators and Attorney Williams subject to disgorgement. Accordingly, we order Harris to pay $34,995.00 in restitution to Tingler; this amount represents the remaining balance of the $50,000 retainer not already refunded, less expenses paid to Attorney Williams and to the investigators for their work on the matter.

## IV. CONCLUSION

For the foregoing reasons, we impose the following sanctions: 1) Harris is hereby suspended from the practice of law for two (2) years and is directed to abide by the duties imposed pursuant to Rule 3.28 of the Rules of Lawyer Disciplinary Procedure; 2) Harris shall be required to petition for reinstatement pursuant to Rule 3.32 of the Rules of Lawyer Disciplinary Procedure; 3) prior to reinstatement, Harris shall furnish proof that he refunded the unearned fee referenced in Count 2 to Tingler in the amount of $34,995.00; 4) if successfully reinstated, and if in private practice, Harris is to obtain and pay the costs associated with annual auditing of accounts associated with his law practice by a certified public accountant for a period of three (3) years and provide a copy of such audit to ODC; and 5) prior to being reinstated to the practice of law, Harris must reimburse the costs of these proceedings to the Lawyer Disciplinary Board pursuant to Rule 3.15 of the Rules of Lawyer Disciplinary Procedure.

Law license suspended and other sanctions imposed.

55